1
2
3
4
5
6
7

8       UNITED STATES DISTRICT COURT

9       SOUTHERN DISTRICT OF CALIFORNIA

10

| | |
|---|---|
| 11  MATTHEW SHACHNO, an individual, on behalf of himself and all persons similarly situated, | Case No.:  22-CV-1215 TWR (JLB) |
| 12 | **ORDER DENYING PLAINTIFF'S MOTION TO REMAND CASE TO STATE COURT** |
| 13                                  Plaintiff, | |
| 14  v. | |
| 15  MARRIOTT INTERNATIONAL, INC., a corporation; and DOES 1 through 50, inclusive, | (ECF No. 10) |
| 16 | |
| 17 | |
| 18                                  Defendants. | |

19

20          Presently before the Court is Plaintiff Matthew Shachno's Motion to Remand Case

21  to State Court (ECF No. 10, "Mot.").  In addition, the Court has received and reviewed

22  Defendant's Opposition to the Motion to Remand (ECF No. 22, "Opp'n") and Plaintiff's

23  Reply in Support of the Motion (ECF No. 26, "Reply").  The Court has carefully considered

24  the Parties' arguments and the relevant law, as well as all pertinent filings, including

25  Plaintiff's Complaint (ECF No. 1-2, "Compl.") and Defendant's Notice of Removal to

26  Federal Court (ECF No. 1, "NOR").  On December 1, 2022, the Court held a motion

27  hearing and issued a Minute Order that **DENIED** Plaintiff's Motion.  (*See* ECF No. 34).

28  This written Order now follows.

# BACKGROUND

## I.  Facts

Plaintiff Matthew Shachno is an individual who was previously employed by Defendant Marriott International, Inc.  (*See generally* Compl. at 1.)  Defendant is incorporated in Delaware and maintains its principal place of business in Maryland but operates in California.  (ECF No. 1-6 ("Wright Decl.") ¶ 2.)  Defendant manages a chain of hotels, resorts, and restaurants throughout California and conducts substantial business in San Diego County, maintaining various facilities and offices within the County.  (Compl. ¶ 2–3, 15, 31.)

From May 2, 2012, to December 31, 2019, Plaintiff was employed by Defendant at Defendant's Marriott Marquis Marina hotel in San Diego.  (Compl. ¶ 3; ECF No. 1-7 ("Schafer Decl.") ¶ 7.)  At all times during his employment, Plaintiff was classified as a non-exempt employee and was paid on an hourly basis.  (Compl. ¶ 3.)  Accordingly, Plaintiff was legally entitled to meal and rest breaks, minimum and overtime wages, and other employment rights and benefits.  (*Id.*)

## II.  Procedural History

On May 23, 2022, Plaintiff filed a putative Class Action Complaint in the Superior Court of California, County of San Diego on behalf of himself and all other similarly situated current and former California employees of Defendant.  (*See generally* Compl.)  Plaintiff's Complaint contains ten claims for: (1) unfair competition, (2) failure to pay minimum wages, (3) failure to pay overtime wages, (4) failure to provide meal periods, (5) failure to provide rest periods, (6) failure to provide accurate wage statements, (7) failure to reimburse employees for required expenses, (8) failure to provide wages due upon separation of employment; (9) failure to provide gratuities, and (10) failure to provide sick pay wages.  (*See generally id.*)

Plaintiff seeks to represent two classes of employees.  For the first claim, Plaintiff seeks to represent all non-exempt hourly employees who at some time during the four years preceding the filing of the Complaint were employed by Defendant in California or staffed

with Defendant by a third-party in California.  (*Id.* ¶ 5.)  For the remaining nine claims, Plaintiff seeks to represent all non-exempt hourly employees who at some time during the three years preceding the filing of the Complaint were employed by Defendant in California or staffed with Defendant by a third-party in California.  (*Id.* ¶ 42.)

Generally, Plaintiff's Complaint alleges that Defendant had a "policy and practice" of "fail[ing] to lawfully compensate [Plaintiff and putative class member] employees."  (*Id.* ¶ 6.)  Plaintiff therefore seeks damages and injunctive relief on behalf of himself and all other class members.  (*Id.* at 48–50 (Prayer for Relief).)  Plaintiff's Complaint explicitly maintains, however, that the amount in controversy for the aggregate claims of all class members does not exceed five million dollars ($5,000,000).  (*Id.* ¶ 5.)

On July 19, 2022, Plaintiff served Defendant, (*see generally* ECF No. 1-4), and on August 18, 2022, Defendant timely filed a Notice of Removal of Action with the United States District Court for the Southern District of California pursuant to the Class Action Fairness Act of 2005 ("CAFA"), 28 U.S.C. § 1332(d).  (*See* NOR at 1–2.)  The Notice of Removal asserts that CAFA provides this Court with original jurisdiction over civil class actions in which any plaintiff is diverse from any defendant and the total amount in controversy exceeds five million dollars ($5,000,000).  (*See id.* ¶ 1.)  According to Defendant, the CAFA requirements are satisfied here because Plaintiff is a California citizen while Defendant is not, (*see id.* ¶¶ 17–18), and the amount in controversy exceeds five million dollars, (*see id.* ¶ 20).

The Notice of Removal asserts that the minimum amount in controversy for six of Plaintiff's ten claims is $11,102,793.75, including attorney's fees.  (*See id.* ¶ 21.)  In support of this estimate, Defense counsel J. Scott Carr filed a declaration explaining how he calculated the amount in controversy for each of the six claims.  (*See generally* ECF No. 1-5 ("1st Carr Decl. 1").)  As additional support, Defendant also submitted Plaintiff's state court Complaint, (*see generally* Compl.), and sworn declarations from Defendant's Vice President of Human Resources, Tiffany Schafer, (*see generally* Schafer Decl.), and Vice President and Secretary, Andrew Wright, (*see generally* Wright Decl.).

On September 15, 2022, in response to Defendant's Notice of Removal, Plaintiff filed the instant Motion to Remand to State Court.  (*See generally* Mot.)  Plaintiff's Motion challenges Defendant's amount-in-controversy estimate and asks this Court to remand the pending action to the Superior Court of California, County of San Diego.  (*See id.* at 2, 11.)

On October 17, 2022, Defendant filed an Opposition to the Motion in which it recalculated the amount in controversy based on Plaintiff's filings in a separate, state court Private Attorney General Act ("PAGA") action between the same parties involving largely the same claims.  (*See generally* Opp'n.)  Relying on assertions made by Plaintiff in the PAGA action, the Opposition estimates that the amount in controversy for four of Plaintiff's ten claims is $18,052,218.78, excluding attorney's fees.  (*See id.* at 2, 12.)

To support this estimate, Defense counsel J. Scott Carr submitted a second declaration explaining how he calculated the amount in controversy for each of the four claims.  (*See generally* ECF No. 22-1 ("2d Carr Decl. 2").)  Defendant also submitted various filings from the PAGA action, including the complaint, (ECF No. 22-2); a declaration from Plaintiff Matthew Shachno, (ECF No. 22-3 ("Shachno Decl.")); and a declaration from Mr. Shachno's damages consultant, (ECF No. 22-4 ("Lietzow Decl.")).  Additionally, Defendant submitted Mr. Shachno's interrogatory responses, (ECF No. 22-5 ("Interrog. Resp.")), and initial disclosures, (ECF No. 22-7), from the present action.

On October 24, 2022, Plaintiff filed a Reply Brief in Support of the Motion to Remand, challenging Defendant's revised and initial calculations.  (*See generally* Reply.)  The Court held a hearing on the Motion on December 1, 2022, during which the undersigned denied the Motion from the bench.  (*See* ECF No. 34.)

## LEGAL STANDARD

Although "[f]ederal courts are courts of limited jurisdiction," *Kokkonen v. Guardian Life Ins. Co. of Am.*, 511 U.S. 375, 377 (1994), "a defendant may remove an action filed in state court to federal court if the federal court would have original subject matter jurisdiction over the action," either through diversity or a federal question.  *Moore-Thomas v. Alaska Airlines, Inc.*, 553 F.3d 1241, 1243 (9th Cir. 2009) (describing 28 U.S.C. § 1441).

4

In 2005, Congress passed the Class Action Fairness Act of 2005 ("CAFA"), Pub. L. No. 109-2, 119 Stat. 9-13 (2005). "CAFA 'relaxed' the diversity requirements for putative class actions." *Canela v. Costco Wholesale Corp.*, 971 F.3d 845, 850 (9th Cir. 2020). "CAFA gives federal courts jurisdiction over certain class actions, defined in § 1332(d)(1), if the class has more than 100 members, the parties are minimally diverse, and the amount in controversy exceeds $5 million." *Dart Cherokee Basin Operating Co. v. Owens*, 574 U.S. 81, 84–85 (2014).

CAFA not only confers original jurisdiction on federal courts, but also authorizes the removal of certain class actions to federal courts. *See* 28 U.S.C. § 1453. Generally, courts "strictly construe [] removal statute[s] against removal jurisdiction," *Gaus v. Miles, Inc.*, 980 F.2d 564, 566 (9th Cir. 1992); however, "no antiremoval presumption attends cases invoking CAFA," *Dart Cherokee*, 574 U.S. at 89. Unlike other removal statutes, "Congress intended CAFA to be interpreted expansively." *Ibarra v. Manheim Invs., Inc.*, 775 F.3d 1193, 1197 (9th Cir. 2015).

"To remove a case from a state court to a federal court, a defendant must file in the federal forum a notice of removal 'containing a short and plain statement of the grounds for removal.'" *Dart Cherokee*, 574 U.S. at 83 (quoting 28 U.S.C. § 1446(a)). Under CAFA, "a defendant's notice of removal need include only a plausible allegation that the amount in controversy exceeds the jurisdictional threshold." *Id.* at 89. If, however, a plaintiff's Complaint "affirmatively states that the amount in controversy does not exceed $5 million," the defendant's notice of removal must "put forward evidence showing that the amount in controversy exceeds $5 million" and must "persuade the court that the estimate of damages in controversy is a reasonable one." *Ibarra*, 775 F. 3d at 1197.

A plaintiff may challenge a defendant's notice of removal through a motion to remand. *See Moore-Thomas*, 553 F.3d at 1244 (discussing 28 U.S.C. § 1447(c)). "[R]emand may be ordered either for lack of subject matter jurisdiction or for 'any defect' in the removal procedure." *Aguon-Schulte v. Guam Election Comm'n*, 469 F.3d 1236, 1240 (9th Cir. 2006) (quoting 28 U.S.C. § 1447(c)). If a plaintiff's motion to remand

challenges the amount-in-controversy estimate in the defendant's notice of removal, "both sides submit proof and the court decides, by a preponderance of the evidence, whether the amount-in-controversy requirement has been satisfied." *Dart Cherokee*, 574 U.S. at 88.

Although the defendant's amount-in-controversy estimate must be grounded in the plaintiff's complaint, the parties may also submit additional "evidence outside the complaint," such as "affidavits or declarations, or other 'summary-judgment-type evidence relevant to the amount in controversy at the time of removal.'" *Ibarra*, 775 F.3d at 1197 (quoting *Singer v. State Farm Mut. Auto. Ins. Co.*, 116 F.3d 373, 377 (9th Cir. 1997)). In addition, the parties may rely on "a chain of reasoning that includes assumptions." *Id.*; *see also Jauregui v. Roadrunner Transp. Servs., Inc.*, 28 F.4th 989, 992 (9th Cir. 2022). These assumptions, however, must have "some reasonable ground underlying them" and cannot be based on "mere speculation and conjecture." *Ibarra*, 775 F.3d at 1197, 1199; *see also Jauregui*, 28 F.4th at 992.

Because the court evaluates a challenged amount-in-controversy estimate under the preponderance of the evidence standard, the defendant need only establish "that the potential damage *could* exceed the jurisdictional amount." *Rea v. Michaels Stores Inc.*, 742 F.3d 1234, 1239 (9th Cir. 2014) (emphasis added) (quoting *Lewis v. Verizon Commc'ns, Inc.*, 627 F.3d 395, 397 (9th Cir. 2010)). Still, "if the evidence submitted by both sides is balanced, in equipoise, the scales tip against federal-court jurisdiction." *Ibarra*, 775 F.3d at 1199. In sum, the defendant has the burden of establishing by a preponderance of the evidence that the amount in controversy could exceed $5 million; if the defendant fails to do so, the federal court lacks subject matter jurisdiction and the case must be remanded. *See* 28 U.S.C. § 1447(c).

## ANALYSIS

Plaintiff does not dispute that the class contains over 100 members or that minimal diversity of citizenship exists under CAFA. (*See generally* Mot.) Instead, Plaintiff challenges removal jurisdiction based solely on the contention that the amount in controversy does not exceed $5 million. (*See id.* at 11.) Therefore, the Court must analyze

the amount in controversy for each of Plaintiff's claims, "first look[ing] to the complaint" and then to any relevant "summary-judgement-type evidence" submitted by either party. *See Ibarra*, 775 F.3d at 1197. Next, the Court must determine whether Defendant's estimated amount in controversy is reasonably supported by a preponderance of the evidence. *See Dart Cherokee*, 574 U.S. at 88.

Defendant has provided two amount-in-controversy estimates here:

| **Notice of Removal (NOR ¶ 21)** | | **Opposition to Motion (Opp'n 12)** | |
|---|---|---|---|
| Minimum Wages | $656,357.00 | Minimum Wages | $2,650,441.23 |
| Meal Periods | $1,312,714.00 | Meal Periods | N/A |
| Rest Periods | $1,312,714.00 | Rest Periods | $7,606,123.56 |
| Wage Statements | $282,750.00 | Wage Statements | $3,168,000.00 |
| Reimbursements | $690,136.00 | Reimbursements | N/A |
| Separation Wages | $4,627,564.00 | Separation Wages | $4,627,564.00 |
| Attorney's Fees | $2,220,558.75 | Attorney's Fees | N/A |
| **Total** | **$11,102,793.75** | **Total** | **$18,052,218.78** |

## I.    Scope of Materials Considered by the Court

Alongside the Opposition to the Motion to Remand, Defendant submitted as exhibits several filings from the Parties' prior PAGA action, including the complaint, (ECF No. 22-2); the Shachno Declaration; and the Lietzow Declaration to support several recalculations in its Opposition and to bolster its initial calculations in its Notice of Removal. In reply, Plaintiff asserts that this Court may not consider the factual allegations from the PAGA filings "because the California Court of Appeal recently confirmed that different and distinct rights are being asserted in a PAGA action than in an action seeking damages." (*See* Reply at 2 (citing *Gavriiloglou v. Prime Healthcare Mgmt., Inc.*, 83 Cal. App. 5th 595, 602–03 (2022)).)

/ / /

Plaintiff is correct that a litigant in a PAGA action asserts different primary rights than a litigant in a typical class action. While a PAGA plaintiff acts as a representative for the "state and general public," the typical class action representative in a wage and hour lawsuit acts as a representative for "individual employees." *See Gavriiloglou*, 83 Cal. App. 5th at 604. This principle, however, does not prevent courts from taking judicial notice of filings from a prior PAGA action. Instead, the primary rights doctrine prevents courts from finding that there is claim or issue preclusion, meaning a final disposition on the merits in a PAGA action does not preclude a subsequent non-PAGA class action involving the same parties and claims. *Id.* at 602–06. Here, Defendant does not assert preclusion-based theories; instead, Defendant asks this Court to consider the PAGA filings as evidence when deciding whether Defendant's amount-in-controversy estimate is reasonable for jurisdictional purposes. Therefore, Plaintiff's argument regarding the primary rights doctrine is not relevant to the Court's jurisdictional analysis.

In any event, at the motion hearing, Plaintiff conceded that the Court may consider the Shachno Declaration as a party admission. (*See* ECF No. 34.) Although Plaintiff argued that the Court may not consider the Lietzow Declaration and took no position on whether the Court could consider the PAGA complaint, (*see id.*), the Court need not address whether such evidence may be considered because the Court's analysis does not rely on that evidence. Rather, the Court relies on all relevant evidence that is not subject to dispute, including: (1) the Shachno Declaration; (2) the present Complaint; (3) Mr. Shachno's initial disclosures and interrogatory responses in this present action; (4) the Carr Declarations; and (5) the Schafer Declaration.

## II.    Failure to Pay Minimum Wages

The first claim at issue in the amount in controversy analysis is Defendant's alleged failure to pay Plaintiff and putative class members minimum wages in violation of California Labor Code §§ 1194 and 1197. (*See generally* Compl. ¶¶ 70–79.) In the Complaint, Plaintiff alleges that Defendant "maintained a wage practice of paying [Plaintiff and putative class members] without regard to the correct amount of time they

work[ed]," (*id.* ¶ 71), and "consequently underpaid the actual time worked by [Plaintiff and putative class members]," (*id.* ¶ 73). Specifically, Plaintiff asserts that class members were not paid for: (1) completing work assignments during meal breaks "from time to time;" (2) undergoing mandatory drug testing; (3) completing mandatory Covid temperature checks and symptom questionnaires; (4) "several minutes off the clock" before work complying with Defendant's personal appearance regulations; and (5) actual time worked, which was always rounded down to benefit Defendant. (*Id.* ¶ 9.)

Defendant, in its Notice of Removal, asserts that the amount in controversy for Plaintiff's minimum wage claim is at least $656,357. (NOR at 6.) Defendant bases this estimate on only one of Plaintiff's five allegations: the allegation that Defendant failed to pay class members for "several minutes off the clock" spent "preparing themselves for work in order to comply with Defendant's extensive personal appearance regulations." (*See* 1st Carr Decl. ¶ 8 (quoting Compl. ¶ 9); *see also* Opp'n at 5.) To arrive at this figure, Defendant used employment records to determine the total number of hours worked by Plaintiff and putative class members during the statutory period. (*See* Schafer Decl. ¶ 4.) Defendant then divided this number by eight hours—the length of a full shift—to reach a conservative estimate of the total number of shifts worked. (*See* 1st Carr Decl. ¶ 8 (quoting Compl. ¶ 9); *see also* Opp'n at 5.) Based on Plaintiff's claim that class members spent "several minutes" preparing for work, Defendant multiplied the number of shifts worked by three minutes. (*See id.*) Defendant then converted this figure to hours and multiplied that number by the average hourly minimum wage during the statutory period. (*See id.*)

Plaintiff challenges Defendant's calculation on several grounds. First, Plaintiff asserts that the estimate is improper because it includes time spent drug testing, complying with mandatory Covid screening (before Covid emerged in 2019), and improper rounding. (*See* Mot. at 3.) Plaintiff is mistaken. Defendant's amount in controversy calculation for the minimum wage claim only accounts for time spent complying with personal appearance regulations, not time spent drug testing or Covid screening, or Defendant's allegedly improper rounding policy. Even so, it would have been proper for Defendant to include

9

these alleged violations in its calculation if it chose to do so.  Furthermore, excluding these violations from the calculation yields a more conservative amount-in-controversy estimate.

Plaintiff next challenges Defendant's assumption that class members spent "three minutes off the clock" complying with grooming regulations before "each shift."  (Mot. at 3–4.)  Plaintiff does not appear to challenge Defendant's assumption that each grooming violation lasted three minutes.  At the motion hearing, Plaintiff admitted that his claim that employees spent "several minutes off the clock" complying with grooming regulations, (Compl. ¶ 9), reasonably supports the assumption that each violation lasted approximately two to four minutes, (*see* ECF No. 34).  Defendant's three-minute estimate is within a range that Plaintiff himself believes is reasonable.  Nonetheless, Plaintiff asserts that Defendant's calculation is improper because it is unreasonable to assume that a violation occurred before "each shift."  (*See id*.; Mot. at 3–4.)  The Court disagrees.

The Complaint alleges that Plaintiff and putative class members "were required by Defendant to spend several minutes off the clock *preparing themselves for work* in order to comply with Defendant's extensive personal appearance regulations."  (Compl. ¶ 9 (emphasis added).)  If a plaintiff broadly alleges wage and hour violations, it may be reasonable for the defendant to assume a 100% violation rate.  *See e.g.*, *Coleman v. Estes Express Lines, Inc.*, 730 F. Supp. 2d 1141, 1150 (C.D. Cal. 2010) ("Plaintiff included no limitation on the number of [wage and hour] violations, and, taking his complaint as true, Defendants could properly calculate the amount in controversy based on a 100% violation rate.").  Here, Plaintiff's Complaint does not contain any limiting language to negate the ordinary and reasonable assumption that one must "prepar[e] themselves for work" each time that they go to work, meaning, before every shift.  (*See* Compl. ¶ 9.)

Furthermore, Plaintiff himself claims that he spent time adhering to Defendant's personal appearance regulations "before each shift," (Interrog. Resp. at 10–11), and "each day," (Shachno Decl. ¶ 4).  It is reasonable to assume that, as the class representative, Mr. Shachno's claims are "typical of the class."  *See e.g.*, *Amchem Prod., Inc. v. Windsor*, 521 U.S. 591, 613 (1997) (describing the typicality requirement of class action

representatives under Federal Rule of Civil Procedure 23(a)).  Accordingly, the Court finds that a three-minute violation before each shift is a reasonable assumption that is grounded in the language of Plaintiff's Complaint and the proof submitted by Defendant.  Therefore, the Court accepts Defendant's estimate of $656,357 as the amount in controversy for Plaintiff's claim for failure to pay minimum wages for time spent complying with Defendant's personal appearance regulations.

In its Opposition to the Motion to Remand, Defendant recalculates the amount in controversy for Plaintiff's minimum wage claim to be at least $2,650,441.23 because Plaintiff's filings from the PAGA action support a 20-minute, rather than 3-minute, violation before every shift.  (*See* Opp'n at 10, 15; *see also* Carr Decl. 2 ¶ 10.)  Defendant grounds this assumption in Mr. Shachno's PAGA declaration, (*see* Opp'n at 10 (relying on Leitzlow Decl. ¶ 10–11 (relying on Shachno Decl. ¶¶ 3–4))), which Plaintiff has admitted is proper for the Court to consider at this time, (*see generally* ECF 34).  In the PAGA declaration, Plaintiff claims that he spent five (5) minutes putting on his uniform before work, five (5) minutes taking off his uniform after work, and ten (10) minutes complying with Defendant's personal appearance requirements, for a total of twenty (20) minutes of unpaid work time each day.  (*See* Shachno Decl. ¶¶ 3–4.)

While Mr. Shachno's PAGA declaration asserts that Defendant is required to compensate employees for time spent putting on and taking off their uniforms, Plaintiff never makes such an allegation in his Complaint.  (*See generally* Compl.)  Although a defendant may support its amount-in-controversy estimate with external evidence, the defendant may not use such evidence to support claims not alleged in Plaintiff's complaint. The Court, therefore, finds Plaintiff's PAGA claims regarding the donning and doffing of uniforms irrelevant to the present amount in controversy determination.  As a result, Defendant is left with insufficient evidence to support its assumption that "every employee worked 20 minutes off-the-clock on a daily basis."  (Opp'n at 15.)  Consequently, Defendant's revised estimate of $2,650,441.23 is not reasonably supported by a preponderance of the evidence.

1  Ultimately, for Plaintiff's minimum wage claim, the Court accepts Defendant's
2  amount-in-controversy estimate of $656,357 from the Notice of Removal but rejects the
3  revised estimate of $2,650,441.23 from its Opposition.

4  **III.  Failure to Provide Meal and Rest Periods**

5  The Complaint also alleges that Defendant violated California Labor Code §§ 226.7
6  and 512 by failing to provide Plaintiff and putative class members with legally required
7  meal and rest breaks.  (*See generally* Compl. ¶¶ 96–103.)  Regarding rest breaks, Plaintiff
8  claims employees were "from time to time" denied a single ten-minute break for shifts of
9  two to four hours, two ten-minute breaks for shifts of six to eight hours, and three ten-
10  minute breaks for shifts of ten hours or more.  (*Id.* ¶ 101.)  As for meal breaks, Plaintiff
11  claims employees were "from time to time" not fully relieved of their duties during meal
12  periods, "from time to time" denied a single meal period prior to their fifth hour of work,
13  and "from time to time" denied a second meal period when working ten-hour shifts on
14  "some workdays."  (*Id.* ¶ 97.)  The Complaint requests one hour of pay for each meal and
15  rest break violation, as mandated by the California Labor Code.  (*Id.* ¶ 98, 102; *see also*
16  Cal. Labor Code § 226.7(c).)

17  In its Notice of Removal, Defendant asserts that the amount in controversy is at least
18  $1,312,714 for the meal period claim and $1,312,714 for the rest period claim.  (NOR at
19  7–8.)  To arrive at these estimates, Defendant used employment records to determine the
20  total number of hours worked by the class during the statutory period.  (*See* Opp'n at 4.)
21  Defendant then divided this number by eight hours to reach a conservative estimate of the
22  total number of days worked.  (*See id.*)  Then, based on the allegation that Defendant denied
23  meal and rest breaks "from time to time," Defendant multiplied the number of days worked
24  by a violation rate of 10% to approximate the total number of meal and rest break
25  violations.  (*See id.*)  Finally, because the statutory penalty for each violation is one hour
26  of pay, Defendant multiplied the number of violations by the average minimum wage
27  during the statutory period.  (*See id.*)
28  / / /

12

Plaintiff challenges this calculation on three grounds: first, Plaintiff claims it was improper to assume a 10% violation rate; second, Plaintiff claims it was improper to use an average minimum wage instead of employees' actual wages; and third, Plaintiff claims it was improper to assume that all employees worked a standard eight-hour shift.  (*See* Mot. at 5–6.)  The Court addresses each argument in turn.

First, the Court finds a 10% violation rate reasonable based on the language in the Complaint.  Plaintiff's Complaint not only alleges that meal and rest break violations occurred "from time to time," but also that, "as a matter of company policy, practice and procedure," Defendant "failed to record all meal and rest breaks missed by [Plaintiff and putative class members]."  (Compl. ¶ 34; *see also id.* ¶ 12.)  This caused class members to "forfeit meal breaks without additional compensation and in accordance with Defendant's corporate policy and practice."  (*Id.* ¶ 12.)  In a similar wage and hour case, another Judge in this District determined that a 20% violation rate was reasonable because the complaint not only claimed that violations had occurred "from time to time" and for "some shifts," but also that the defendant had failed to compensate for such violations as a matter of "company policy, practice and procedure."  *See Cavada v. Inter-Cont'l Hotels Grp., Inc.*, No. 19CV1675-GPC(BLM), 2019 WL 5677846, at *5 (S.D. Cal. Nov. 1, 2019).  This language closely mirrors that used by Plaintiff in his Complaint.  Here, however, Defendant has employed a more conservative 10% violation rate instead of the 20% rate accepted by the court in *Cavada*.  Accordingly, the Court finds that Defendant's assumed violation rate is reasonably grounded in the allegations made in Plaintiff's Complaint.

The Court also finds Defendant's use of the average minimum wage reasonable.  According to Plaintiff, Defendant's calculations cannot be accepted because Defendant assumed "an arbitrary 'average' of minimum wages in effect without any evidence of what [Plaintiff and putative class members] were actually paid."  (*See* Mot. at 5.)  Although it may have been possible for Defendant to use employee records to determine Plaintiff and putative class members' actual wages, a party's access to additional information does not necessarily render the assumptions made by that party unreasonable.  Here, for example,

22-CV-1215 TWR (JLB)

Defendant used the average minimum wage during the statutory period "to make [its] calculations as conservative as possible," (Carr Decl. 1 ¶ 12), because employees' actual hourly rates "would have been higher" than minimum wage, (*see* Opp'n at 16). Defendant's assumption that its employees earned at least minimum wage is reasonable because an employee's "regular rate of compensation" must meet or exceed minimum wage. *See* Cal. Lab. Code §§ 226.7(c), 1194. Therefore, using employees' actual wages in the calculation, as Plaintiff requests, would only result in a higher estimate.

Finally, Plaintiff challenges Defendant's assumption that all employees worked exactly eight hours each shift. (*See* Mot. at 5; Reply at 1.) According to Plaintiff, "Defendant's calculation completely fails to consider the actual number of shifts worked" and "whether meal or rest breaks were owed based on the length of shifts." (Reply at 1.) The Court agrees that Defendant's failure to determine whether breaks were owed based on the length of each shift renders the amount-in-controversy estimate for the meal break claim unreliable; however, this does not affect the reliability of the estimate for the rest break claim.

According to Plaintiff's Complaint, all of Defendant's employees were owed a meal break prior to their fifth hour of work and again when working shifts of ten hours or more. (Compl. ¶ 97; *see also id.* ¶ 59.) Therefore, Defendant's assumption that each shift lasted exactly eight hours potentially overestimates the number of meal breaks owed, as Defendant admitted at the motion hearing. (*See* ECF No. 34.) If even one putative class member had worked a shift of less than five hours, and accordingly was not owed a meal break, Defendant's amount in controversy calculation would be an overestimate. A defendant cannot "rely on speculative and self-serving assumptions about key unknown variables." *Vasserman v. Henry Mayo Newhall Mem'l Hosp*., 65 F. Supp. 3d 932, 976 (C.D. Cal. 2014) (quoting *Garibay v. Archstone Comties.*, LLC, 539 F. App'x 763, 764 (9th Cir. 2013)). Here, the number of shifts during which a meal break was owed is a key unknown variable, and Defendant's assumption that meal breaks were owed for every shift

/ / /

is not reasonable.  Therefore, Defendant's $1,312,714 amount-in-controversy estimate for the meal break violations must be rejected.

Defendant's use of a presumptive eight-hour shift does, however, lead to a conservative estimate of rest break violations.  For the amount in controversy calculation, Defendant assumed one rest break violation for every ten shifts, with each shift lasting exactly eight hours.  (*See* Opp'n at 4; 1st Carr Decl.)  Unlike meal breaks, which are only required for shifts of five hours or more, rest breaks are required for shifts as short as two hours, according to Plaintiff's Complaint.[1]  (*See* Compl. ¶¶ 12, 101.)  Therefore, if Plaintiff and putative class members in fact worked shorter, more frequent shifts, (*see* Opp'n at 5 n. 1), and these shifts typically lasted at least two hours, as is reasonable to assume, there would be more shifts in which a rest break violation could have occurred.  If, for example, an employee in fact worked two four-hour shifts rather than one eight-hour shift, as Defendant assumed, there would be twice as many shifts in which a rest break violation could have occurred.

Thus, Defendant's use of a presumptive eight-hour shift results in a conservative estimate of total shifts and, in turn, a conservative estimate of rest break violations.  If Defendant instead used the actual number of shifts worked by Plaintiff and putative class members lasting at least two hours, the amount in controversy would likely be higher.  The Court therefore finds Defendant's amount in controversy calculation reasonable and accepts the $1,312,714 estimate for rest break violations.

In the Opposition to the Motion to Remand, Defendant recalculates the amount in controversy for the rest period claim using a 100% violation rate rather than a 10% violation rate, yielding an amount in controversy of $7,606,123.56.  (*See* Opp'n at 11.)

---

[1] In the Opposition, Defendant asserts that, "a shift of at least 3.5 hours . . . triggered [Marriott International, Inc.'s] rest break obligation," (Opp'n at 11 (relying on PAGA filings)); however, Plaintiff's Complaint merely states that employees were denied rest breaks for shifts "of at least two (2) to four (4) hours," (*see* Compl. ¶ 101.  For purposes of this jurisdictional analysis, the Court relies on the allegations in the Complaint rather than the PAGA filings.

According to Defendant, a 100% violation rate is reasonable because the Complaint implies that the "rest break policy is per se unlawful because it purportedly restricts employees to [Defendant's] premises for their rest breaks, resulting in a violation every time an employee is entitled to a rest break." (*Id.* at 17 (emphasis omitted).) The Complaint, however, does not go as far as Defendant claims.

The Complaint states, "Defendant's policy restricts [Plaintiff and putative class members] from unconstrained walks and is unlawful based on Defendant's rule which states [Plaintiff and putative class members] cannot leave the work premises during their rest period." (Compl. ¶ 13.) "Caselaw dictates that a 100% violation rate [for rest period claims] is not reasonable based on allegations of a 'pattern and practice,' but violation[] rates of 25–60% based on both 'pattern and practice' and 'policy and practice' are reasonable." *See Cavada*, 2019 WL 5677846, at *7 (citing *Ibarra*, 775 F.3d at 1198–99 and collecting district court cases). Here, Plaintiff's Complaint alleges an unlawful rest break "policy" but does not go so far as to claim Defendant had a "pattern or practice" of enforcing this policy. Even if Plaintiff had alleged "a uniform or systematic violation of labor laws pertaining to . . . rest breaks," this would "not necessarily mean that a violation occurred every single day that the employee worked." *See Sanders v. Old Dominion Freight Line, Inc.*, No. 16-CV-2837-CAB-NLS, 2017 WL 5973566, at *4 (S.D. Cal. Feb. 2, 2017); *see also Ibarra*, 775 F. 3d at 1198–99.

Furthermore, the Complaint does not allege that class members are entitled to penalties for every rest break because of Defendant's policy. Instead, the Complaint seeks penalties "for each workday that [a] rest period was not provided" and only for those "who were not provided a rest period." (Compl. ¶ 102.) In a similar wage and hour case in the Central District of California, the plaintiff's complaint used the exact same language that Plaintiff uses here, demanding compensation "for each workday that a rest period was not provided." *See Wheatley v. MasterBrand Cabinets, LLC*, No. EDCV 18-2127 JGB (SPx), 2019 WL 688209, at *5 (C.D. Cal. Feb. 19, 2019). There, the court determined that such language "impl[ied] that there were days when rest breaks were provided" and therefore

the allegations in the complaint did not support a 100% violation rate.  *See id*.; *see also Sanders*, 2017 WL 5973566, at \*4 (finding the same regarding the plaintiff's meal break claims).  The language in Plaintiff's Complaint here likewise implies that some employees were in fact provided proper rest breaks during some shifts.  Therefore, the Complaint does not support a 100% violation rate.  Consequently, the Court rejects Defendant's revised $7,606,123.56 estimate for rest period violations.

Ultimately, the Court accepts Defendant's $1,312,714 amount-in-controversy estimate for rest period violations but rejects its $1,312,714 estimate for meal period violations and its $7,606,123.56 estimate for rest period violations.

## IV.    Failure to Provide Accurate Wage Statements

Next, the Complaint alleges Plaintiff's and putative class members' wage statements "from time to time" did not accurately reflect the total hours worked or wages earned, in violation of California Labor Code § 226.  (*See* Compl. ¶¶ 19, 106.)  "More specifically," Plaintiff alleges, "the wage statements failed to identify the accurate total hours worked each pay period."  (*Id.* ¶ 106.)  Plaintiff asserts that these violations were knowing and intentional, entitling Plaintiff and putative class members to $50 for each initial violation and $100 for each subsequent violation up to a potential total of $4,000 per employee. (*See id.* ¶ 107.)

In the Notice of Removal, Defendant asserts that the amount in controversy for the wage statement claim is $282,750.  (*See* NOR at 9; 1st Carr Decl. ¶¶ 16–18.)  To reach this estimate, Defendant assumed two wage statement violations per employee, resulting in a $150 penalty each ($50 for the first violation and $100 for the second).  (*See* 1st Carr Decl. ¶¶ 16–18; *see also* Opp'n at 6; Schafer Decl. ¶¶ 4–5.)  Defendant then multiplied the $150 penalty by the total number of "non-exempt employees who received wage statements" during the statutory period, "from May 23, 2021[,] through July 22, 2022."  (1st Carr Decl. ¶ 18; *see also* Schafer Decl. ¶ 4.)

/ / /

/ / /

Plaintiff claims Defendant's estimate is "unreasonable and unsupported" because the Complaint "does not allege that the wage statement violation[s] occurred on two wage statements issued to each [putative class member]" but that Defendant "from time to time" engaged in wage statement violations. (Mot. at 8.)  Because Defendant does not disclose how many wage statements each class member received during the statutory period, the Court cannot determine whether two violations is a reasonable assumption.

Although Defendant identifies how many employees received wage statements at some point during the one-year statutory period, Defendant does not reveal how many wage statements each employee received in total.  When calculating the amount in controversy for an inaccurate wage statement claim, the number of wage statements received by each employee during the statutory period is a key variable.  *See Vasserman*, 65 F. Supp. 3d at 976; *see also Mariscal v. Ariz. Tile, LLC*, No. 8:20-cv-02071-JLS-KES, 2021 WL 1400892, at *4 (C.D. Cal. 2021) (approving amount-in-controversy estimate based on total number of wage statements); *Wicker v. ASC Profiles, LLC*, No. 2:19-cv-02443-TLN-KJN, 2021 WL 1187271, at *4 (E.D. Cal. 2021) (approving amount-in-controversy estimate based on total number of wage statements and employees).

Defendant's reliance on the total number of employees rather than the total number of wage statements renders its amount-in-controversy estimate unreliable.  If, for example, an employee worked for the entire one-year statutory period and received inaccurate wage statements "from time to time," two violations would be reasonable.  If, however, an employee worked for only one month during the statutory period and received inaccurate wage statements "from time to time," two violations would not be reasonable.  Defendant's amount-in-controversy estimate is based on the unsupported assumption that all employees in the class worked for Defendant long enough during the statutory period such that two violations would constitute a violation "from time to time."  *Cf.*, *Blevins v. Republic Refrigeration, Inc.*, No. CV 15-04019 MMM (MRWx), 2015 WL 12516693, at *11 (C.D. Cal. 2015) (rejecting amount in controversy when Defendants failed to account for class members "who did not work . . . for a sufficiently long period of time to accrue the

18

1    maximum number of violations."). Accordingly, the Court rejects Defendant's $282,750
2    estimate for wage statement violations.

3         In the Opposition to the Motion to Remand, Defendant recalculates the amount in
4    controversy for Plaintiff's inaccurate wage statement claim as $3,168,000. (*See* Opp'n at
5    12). Defendant's revised calculation assumes that the PAGA filings support "a wage
6    statement violation every pay period," (*see id*. (emphasis omitted); Carr Dec. 2 ¶ 12), even
7    though Plaintiff's Complaint only claims that violations occurred "from time to time." (*See*
8    Compl. ¶¶ 19, 106.) When a defendant's assumptions directly conflict with the allegations
9    in the plaintiff's complaint, the complaint controls, rendering the defendant's assumption
10   unreasonable. *See Ibarra*, 775 F.3d at 1197, 1199.

11        Furthermore, Defendant's revised calculation still disregards the number of wage
12   statements issued during the statutory period, instead using a wage statement estimate
13   provided by Mr. Lietzow in the PAGA action. (*See* Opp'n at 12; 2d Carr Dec. ¶ 12.) Use
14   of this metric is unreasonable because Defendant has access to records showing the number
15   of wage statements issued during the statutory period. For the foregoing reasons, the Court
16   rejects Defendant's revised $3,168,000 estimate for wage statement violations.

17   **V.    Failure to Reimburse**

18        The Complaint next alleges that "[a]t all relevant times" Defendant failed to
19   "reimburse [Plaintiff and putative class members] for required expenses incurred in the
20   discharge of their job duties" in violation of California Labor Code § 2802. (Compl. ¶ 110.)
21   Specifically, Plaintiff claims that it was Defendant's "policy and practice" to deny Plaintiff
22   and putative class members reimbursement for "expenses resulting from using their
23   personal cellular phones." (*Id.*) Plaintiff also alleges that Defendant failed to reimburse
24   employees for uniform expenses, (*see id.*); however, Defendant does not factor this cost
25   into its amount in controversy calculation, (*see generally* NOR).

26        Defendant asserts that the amount in controversy for Plaintiff's reimbursement claim
27   is $690,136 based on cell phone expenses alone. (*See* Opp'n at 20.) To arrive at this figure,
28   Defendant used employment records to determine the total number of hours worked by the

class during the statutory period.  (*See* Schafer Decl. ¶ 4.)  Defendant then divided this number by eight hours to reach a conservative estimate of the total number of days worked.  (*See* Carr Decl. 1 ¶ 27.)  Defendant then divided this number by thirty days to reach a conservative estimate of the total number of months worked, assuming each employee worked a full shift every day.  (*See id*.)  Finally, Defendant multiplied the number of months worked by $20, Defendant's estimated monthly cell phone reimbursement fee per employee.  (Opp'n at 20.)

Plaintiff does not contest the $20 monthly reimbursement rate, (*see generally* Mot.), as several courts in this district have approved a similar monthly fee, *see e.g., Cavada*, 2019 WL 5677846, at *7 (approving $20); *Vallejo v. Sterigenics U.S., LLC*, No. 3:20-cv-01788-AJB-AHG, 2021 WL 2685348, at *6 (S.D. Cal. June 29, 2021) (approving $25).  This amount is generally considered "a reasonable percentage of [employees'] cell phone bills" for an employer to pay.  *See Cochran v. Schwan's Home Servs., Inc.*, 228 Cal. App. 4th 1137, 1140 (2014).

Instead, Plaintiff challenges "Defendant's assumption that every [putative class member] would require reimbursement every month of their employment."  (Mot. 10.)  According to Plaintiff, this assumption is "unreasonable and unsupported" because the Complaint does not allege that Defendant denied reimbursement "due to a standard policy and practice."  (*See id*.)  Contrary to Plaintiff's assertion, however, the Complaint does in fact allege that Defendant denied reimbursement for work-related cell phone expenses as a matter of "policy and practice."  (Compl. ¶ 110.)

Furthermore, the Complaint's assertion that Plaintiff and putative class members used their cell phones for work "over the course of their employment," (*id*. ¶ 28), though vague, is sufficient to support the assumption that these employees "incurred at least one reimbursable cell phone expense for each month worked during the class period."  *See Vallejo*, 2021 WL 2685348, at *4 (finding only one violation necessary to impose $25 monthly fee).  Although the plaintiff is the master of their complaint, they cannot "avoid federal jurisdiction by purposefully opaque pleading."  *Herrera v. Carmax Auto*

*Superstores Cal., LLC*, No. EDCV-14-776-MWF (VBKx), 2014 WL 12586254, at *2 (C.D. Cal. June 12, 2014). If a complaint uses broad or vague terms, as Plaintiff's does here, the defendant may "make reasonable, conservative estimates about the frequency of the alleged violations based on the language used in [that] complaint." *Id.*

Based on the language in Plaintiff's Complaint here, Defendant's estimate is reasonable. In *Vallejo*, the complaint alleged that class members used personal cell phones "for work-related duties" "[t]hroughout the time period." 2021 WL 2685348, at *6 (alterations in original). This allegation was sufficient to support the defendant's assumption that all employees were entitled to a monthly reimbursement. *Id.* As in *Vallejo*, the Complaint here alleges that class members were required to use their personal cell phones "in furtherance of their job duties" "in the course of their employment." (Compl. ¶ 28; *see also* Interrog. Resp. at 30–31 (asserting phones were used "for work related issues").) This allegation also supports the assumption that employees are entitled to a monthly reimbursement. Therefore, the Court accepts Defendant's amount-in-controversy estimate of $690,136 for Plaintiff's failure to reimburse claim.

## VI. Failure to Provide Wages Upon Separation

The Complaint next alleges Defendant failed to pay Plaintiff and putative class members wages due upon separation in violation of California Labor Code § 203. (*See generally* Compl. ¶¶ 112–19.) When an employer willfully fails to pay wages upon separation, the Labor Code provides that "the wages of the employee shall continue as a penalty from the due date ther[e]of at the same rate until paid or until an action therefor is commenced; but the wages shall not continue for more than 30 days." Cal. Lab. Code § 203.

Defendant asserts that the amount in controversy for Plaintiff's overdue wages claim is $4,627,564. (*See* Opp'n at 20.) To reach this estimate, Defendant used employment records to identify how many class members separated from employment during the statutory period, when those class members separated, and what those class members' hourly pay rates were at the time of separation, if available. (*Id.* at 19–20.) Defendant

then calculated the daily wage of each separated employee by multiplying their actual hourly rate at the time of termination by eight hours. (1st Carr Decl. ¶ 24.) When records of an employee's actual hourly rate were unavailable, Defendant used the California minimum wage at the time of termination to calculate the employee's daily wage. (*Id.*) Then, for those class members whose employment terminated *more* than thirty days before the filing of the Notice of Removal, Defendant multiplied each employee's daily wage by thirty days. (*Id.* ¶ 25.) For those class members whose work terminated *less* than thirty days before the filing date, Defendant multiplied each employee's daily wage by the number of days between their termination date and the filing date. (*Id.*)

Plaintiff challenges Defendant's calculation on multiple grounds. First, Plaintiff claims Defendant's estimate is unsupported because Defendant does not offer "justification for the number of class members" used in the calculation. (Mot. at 9.) To the contrary, Defendant has provided a form of justification typical in CAFA removal actions: a sworn declaration from a member of Defendant's management. (*See generally* Schafer Decl.) In this declaration, Defendant's Vice President of Human Resources explains that she "carefully reviewed a report compiled from Defendant's employee data records" and determined that "at least 1,219 of Defendant's non-exempt employees in the State of California separated from employment" during the statutory period. (*See id.* Decl. ¶¶ 3–4.) This is the same number used by Defendant in its calculation. (*See* 1st Carr Decl. ¶¶ 23–24). Thus, Defendant has provided sufficient justification for the number of class members used in its calculation.

Next, Plaintiff challenges Defendant's "assumption that every single [separated employee] is owed 30 days of waiting time penalties, imputing that each of the former employees worked eight hours for 30 consecutive days." (Mot. at 9.) Plaintiff is mistaken on multiple grounds. First, Defendant does not assume that every employee is owed thirty days of waiting time penalties. For those employees whose employment terminated less than thirty days before the filing date, Defendant did not assume thirty days of waiting time penalties. Instead, Defendant calculated the number of days between each employee's

termination date and the filing date and only assessed penalties for those days.  (1st Carr Decl. ¶ 25.)

Additionally, Defendant's conclusion that some employees would be owed a full thirty days of waiting time penalties does not rely on the assumption that each of these "former employees worked eight hours for 30 consecutive days" prior to separation, as Plaintiff asserts.  (*See* Mot. at 9.)  A claim for "failure to pay wages [upon separation] has nothing to do with the number of days an employee works during the month," as "wages continue to accrue on [a] daily basis while wages remain unpaid . . . not only on days that [an] employee might have worked, but also on nonwork days."  *Mamika v. Barca,* 68 Cal. App. 4th 487, 492–93 (1998).  Furthermore, daily wages are commonly calculated by multiplying each employee's hourly rate by eight hours, as Defendant has done here.  *See e.g., Andrade v. Arby's Rest. Grp., Inc*., 225 F. Supp. 3d 1115, 1139 (N.D. Cal. 2016); *Kao v. Holiday*, 12 Cal. App. 5th 947, 963 (2017).  Therefore, it is reasonable to assume that penalties should accrue daily, regardless of how frequently an employee worked prior to separation.

Finally, Plaintiff challenges Defendant's assumption that each separated employee would have been owed some unpaid wages.  (Mot. at 9.)  The Court finds such an assumption adequately supported by the allegations in Plaintiff's Complaint.   The Complaint claims that "*all* who terminated employment" during the statutory period were owed unpaid wages under California Labor Code § 203, and that it was "Defendant's *policy and practice* . . . to unlawfully and intentionally deny timely payment of wages due." (Compl. ¶¶ 71, 119 (emphasis added).)  Multiple courts within this district have approved a 100% violation rate when the plaintiff's complaint made similar allegations.  *See e.g., Brumbach v. Hyatt Corp*., No. 20-cv-2231-WQH-KSC, 2021 WL 926692, at *10 (S.D. Cal. Mar. 11, 2021) (approving 100% violation rate when complaint alleged "consistent and uniform policy, practice and procedure of failing to pay . . . wages"); *Sanders v. Old Dominion Freight Line, Inc*., No. 17cv2340-CAB-NLS, 2019 WL 1193836, at * 6 (S.D.

/ / /

23

Cal. Mar. 8, 2018) (approving 100% violation rate when complaint requested overdue wages for all separated employees).

Furthermore, as Defendant points out, Plaintiff's overdue wages claim is "derivative" of all other claims in Plaintiff's Complaint. (*See* Opp'n at 18.) Thus, if Defendant owed an employee for minimum wage violations, meal or rest break violations, inaccurate wage statements, or unpaid reimbursements, Defendant would also owe this employee waiting time penalties upon separation. For the purposes of this jurisdictional analysis, the Court has determined that the Complaint reasonably supports the following violations: a three-minute grooming violation before each shift, *see supra* Section II; one unpaid rest break per ten-day work period, *see supra* Section III; and one unpaid cell phone fee per month, *see supra* Section V. Based on these findings, it is reasonable to assume that each separated employee would have been owed at least some unpaid wages upon separation.

This presumption is bolstered by the court's holding in *Vallejo*, in which another judge in this District approved a 100% violation rate for separated employees based on the following violations: "one hour of unpaid overtime per five-day work period" and "at least five unpaid rest [breaks] and one unpaid meal break." *See* 2021 WL 2685348, at *5. For the foregoing reasons, the Court accepts Defendant's $4,627,564 estimate for the overdue wages claim as reasonably supported by a preponderance of evidence.

## VII. Attorney's Fees

Plaintiff's Complaint also seeks reasonable attorneys' fees. (Compl. ¶ 128.) Accordingly, the amount-in-controversy estimate in Defendant's Notice of Removal includes attorneys' fees, approximated at 25% of the total damages. (*See* NOR at 10.) "Because the law entitles [plaintiff] to an award of attorneys' fees if he is successful, such future attorneys' fees are at stake in the litigation, and must be included in the amount in controversy." *Fritsch v. Swift Transp. Co. of Az.*, 899 F.3d 785, 794 (9th Cir. 2018). Plaintiff, however, asserts that a 25% benchmark fee is not supported by any evidence provided by Defendant. (*See* Mot. at 9–10.)

In wage and hour class actions such as this, courts commonly use a 25% benchmark for attorneys' fees when analyzing an amount-in-controversy estimate for jurisdictional purposes. *See e.g., Vallejo*, 2021 WL 2685348, at *6; *Ramos v. Schenker, Inc.*, No. 5:18-cv-01551-JLS-KK, 2018 WL 5779978, at *3 (C.D. Cal. Nov. 1, 2018); *see also Staton v. Boeing Co.*, 327 F.3d 938, 968 (9th Cir. 2003).  Generally, courts only deviate from this benchmark in cases where a contract or statute limits the fee award.  *See Fritsch*, 899 F.3d at 797.  Still, a "defendant must prove the amount of attorneys' fees at stake by a preponderance of the evidence," and the Court "may not relieve the defendant of its evidentiary burden by adopting a per se rule." *Id.* at 796.  Accordingly, Defendant, in its Opposition, endeavored to meet this evidentiary burden by identifying several similar wage and hour cases in this Circuit in which Plaintiff's counsel sought and received a 33% fee award.  (Opp'n at 21–22 (discussing *Ortega v. Loyal Source Gov't Servs. LLC*, No. 3:20-cv-00879, 2022 WL 378426, at *1, *6 (S.D. Cal. Feb. 7, 2022); Order Granting Motion for Attorneys' Fees at 11, *Ayala v. UPS Supply Chain Solutions, Inc.*, Case No. 5:20-cv-00117 (C.D. Cal. Jan. 18, 2022), ECF No. 110).)

Based on this evidence and the Court's experience, Defendant's use of a 25% attorneys' fee is reasonable and appropriate.  Here, the Court has accepted Defendant's amount in controversy calculations for the minimum wage claim ($656,357), rest break violation claim ($1,312,714), failure to reimburse claim ($690,136), and wages due upon separation claim ($4,627,564), bringing the total amount in controversy for four of Plaintiff's ten claims to **$7,286,771**.  Accordingly, a 25% attorneys' fee of **$1,821,692.75** ($7,286,771 x 0.25) is appropriate.

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

## VIII.  Total Amount in Controversy

Based on the above analysis, the Court concludes that Defendants have demonstrated by a preponderance of the evidence that total amount in controversy for four of Plaintiff's claims and attorney's fees is **$9,108,463.75**, broken down as follows:

| | |
|---|---:|
| Minimum Wages | $656,357.00 |
| Meal Periods | N/A |
| Rest Periods | $1,312,714.00 |
| Wage Statements | N/A |
| Reimbursements | $690,136.00 |
| Separation Wages | $4,627,564.00 |
| Attorney's Fees | $1,821,692.75 |
| **Total** | **$9,108,463.75** |

This amount far exceeds the $5 million threshold required to bring a CAFA action in federal court.  As a result, this Court has subject-matter jurisdiction.

### CONCLUSION

In light of the foregoing, the Court **DENIES** Plaintiff's Motion to Remand to State Court (ECF No. 10).

**IT IS SO ORDERED.**

Dated:  January 19, 2023

Honorable Todd W. Robinson
United States District Judge

22-CV-1215 TWR (JLB)